# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

## CASE NO. 21-CV-21022-BB

HNA LH OD, LLC,

      Plaintiff,

v.

LOCAL HOUSE INTERNATIONAL, INC.,
LH 350 OCEAN MANAGER, LLC, and
BRYAN DUNN,

      Defendants.

_____/

## PLAINTIFF'S MOTION FOR ENTRY OF
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
## AND MEMORANDUM OF LAW IN SUPPORT THEREOF

Pursuant to Fed. R. Civ. P. 65 and 15 U.S.C. § 1116, Plaintiff, HNA LH OD, LLC ("HNA"), hereby moves for the entry of a temporary restraining order and, upon expiration of the temporary restraining order, a preliminary injunction. against Defendants. Local House International, Inc. ("Local House"), LH 350 Ocean Manager, LLC ("Ocean Manager"), and Bryan Dunn (collectively "Defendants" and Local House and Ocean Manager, collectively "Life House"). This Motion is being served upon Defendants simultaneously with Plaintiff's Verified Complaint for Injunctive Relief, Damages, and Declaratory Relief. HNA submits the following Memorandum of Law.

## I.      INTRODUCTION

As described in Plaintiff's Verified Complaint ("Complaint"), which is being filed contemporaneously with this Motion, Defendants are knowingly and intentionally interfering with HNA's efforts to re-open and operate its hotel, located at 350 Ocean Drive (the "Hotel"). Defendants have no current affiliation or connection with the Hotel, and have had no affiliation or connection since September, 2020. Defendants, however, *want* a connection or affiliation with the Hotel and have taken unlawful actions in an attempt to clear the marketplace of any competitors who can manage and operate the Hotel for Plaintiff ("Potential Operators"). Defendants' unlawful actions include: 1) literally false advertisements of the Hotel that deceive the consuming public and Potential Operators of the Hotel; and 2) tortious interference with business relationships, namely, sending threatening letters and making other tortious contacts with Potential Operators of the Hotel.

Defendants' unlawful activities have caused, and will continue to cause, HNA irreparable injury. Among other things, Defendants have (1) deceived the consuming public and Potential Operators of the Hotel about Defendants' affiliation and connection with the Hotel and Defendants' ability to make bookings at the Hotel; (2) caused irreparable false impressions about the Hotel in the online marketplace for hotel properties to the consuming public; and (3) destroyed HNA's attempts to negotiate and contract with Potential Operators to re-open and manage the Hotel.  Defendants have engaged in these unlawful actions in order to reap the potential benefit of a less competitive, and manipulated marketplace that would allow for ***them*** to procure a new management contract for the Hotel.

Defendants should not be permitted to continue their unlawful activities, and thus, HNA seeks entry of a temporary restraining order and preliminary injunction: (i) ordering Life House to

take down all third party website listings that advertise or promote bookings or accommodations at the "Life House, Ocean Drive" or any other listing that attempts to affiliate or connect Defendants with the Hotel; (ii) enjoining Life House from placing any listing, including website listings, that advertises or promotes bookings or accommodations at the "Life House, Ocean Drive" or any other listing that attempts to affiliate or connect Defendants with the Hotel; and (iii) enjoining all communications or contacts by Defendants with parties with whom HNA is negotiating or contracting to manage and operate the Hotel.

## II.   STATEMENT OF FACTS

### A.   350 Ocean Drive Hotel and Life House

In August 2019, HNA purchased the 81-room hotel, formerly known as "The Lord Balfour Hotel," located at 350 Ocean Drive, Miami Beach, Florida, 33139 (the "Hotel"). (Complaint at ¶¶ 19-20.) Since the August 2019 purchase by HNA, the Hotel has not operated or accepted reservations from consumers under any name other the "The Lord Balfour Hotel." (*Id.* at ¶¶ 40-41.)

Life House and affiliates of Life House are in the business of operating hotels and currently operate hotels under the Life House brand and other non-branded hotels. (*Id.* at ¶16-17.) **Life House and its affiliates do not own any hotels and have not owned any hotels in the past**. (*Id.* at ¶18.)

On August 12, 2019, Life House affiliate, Defendant Ocean Manager, entered a Hotel Management Agreement with HNA (the "Management Agreement"). (*Id.* at ¶ 21.) Pursuant to the Management Agreement, Ocean Manager operated the Hotel until September 2020. (*Id.* at ¶ 22.)

On or about August 12, 2019, HNA LH OD MZ, LLC ("Mezz Borrower"), the sole member of HNA, entered into a Mezzanine Loan Agreement with Moto Capital Group Master

Fund Ltd. ("Moto") ("Mezzanine Loan Agreement ") whereby Moto lent Mezzanine Borrower the sum of $10,300,000 (the "Mezzanine Loan"). (*Id*. at ¶¶ 24-25.) Mezz Borrower borrowed the money under the Mezzanine Loan to acquire the hotel, and make certain renovations and improvements to the Hotel.  (*Id.* at ¶ 26.) As part of the Mezzanine Loan Agreement, Mezz Borrower was required to provide to Moto a certain Mezzanine Consent of Manager dated August 12, 2019, signed by Ocean Manager (the "Mezzanine Consent"). (*Id*. at ¶ 27.) Mezz Borrower, and the guarantors of the Mezzanine Loan, coordinated the procurement of the Mezzanine Consent from Ocean Manager to be delivered to Moto. (*Id.* at ¶ 28.) The Mezz Consent provided that if Mezz Borrower defaulted under the Mezzanine Loan, and Moto sought to enforce its rights under the Mezzanine Loan Agreement, Hotel Manager could be terminated as manager of the Hotel separate and apart from any termination mechanism required the Hotel Management Agreement. (*Id.* at ¶¶ 29-30.)

Ultimately, Mezz Borrower defaulted under the Mezzanine Loan Agreement and Moto sued to enforce its security interest in the pledged collateral by virtue of a UCC foreclosure sale, which resulted in ownership of the Mezz Borrower's interests in HNA being transferred to Moto. (*Id.* at ¶ 29.) Following the default, the Hotel Management Agreement was terminated on multiple occasions under the terms of the Mezzanine Consent in September 2020 by both HNA and Moto (the "Termination"). (*Id.* at ¶¶ 30-31.) At the end of October 2020, Ocean Manager and several related Life House entities filed suit against HNA in Case No. 655719/20, pending in the Commercial Division of the Supreme Court of the State of New York in the County of New York (the "New York Litigation") relating to the termination of the Hotel Management Agreement. (*Id*. at ¶ 45.)

Pursuant to the Termination, on September 22, 2020, Life House representatives were escorted out of the Hotel property and have only re-entered the property since that date, upon permission of Life House, to retrieve their Life House branded items. (*Id.* at ¶ 39.) Since the Termination, Life House has not operated the Hotel and has not had any rights to operate the Hotel. (*Id.* at ¶ 37.) HNA continues to own the Hotel as of the date of the Complaint. (*Id.* at ¶ 35.) Life House has not held, does not hold, and never has had any ownership interest in the Hotel. (*Id.* at ¶ 38.)

The Hotel is not currently open and has not been open or accepting reservations from consumers since 2019. (*Id.* at ¶ 40.) The Hotel has never accepted reservations from consumers, booked reservations for consumers, or provided accommodations to customers under the name "Life House, Ocean Drive." (*Id.* at ¶ 42.)

Despite the Termination, Life House desires to manage and operate the Hotel. (*Id.* at ¶ 64.) Since September 2020 and through the date of the Complaint and this Motion, Life House has continually contacted HNA about Life House's interest in managing and operating the Hotel under a new management agreement. (*Id.* at ¶ 64.) HNA has denied all offers by Life House that included Life House as manager and operator of the Hotel. (*Id.* at ¶ 65.)

**B.      HNA Seeks a New Operator of a Hotel and Life House Interferes**

Following the termination of Ocean Manager as operator of the Hotel, HNA and its affiliates have sought to retain a new operator for the Hotel that could finish the renovation of the Hotel, begin accepting reservations from consumers, and re-open and operate the Hotel. (*Id.* at ¶ 43.) Since October 2020, HNA has been in contact and negotiations with several potential hotel operators for the Hotel ("Potential Operators"). (*Id.* at ¶ 44.)

In September 2020, HNA entered into an agreement with The Avington Group to serve as a financial advisor and run a request for proposal process (RFP) to solicit proposals for a management company for the Hotel, and HNA agreed to pay The Avington Group a monthly fee and a success fee. (*Id*. at ¶ 46.) Weeks later, on November 11, 2020, counsel for Life House sent a letter to The Avington Group (the "Avington Letter"), stating that they were aware that The Avington Group was representing HNA in connection with a request for proposals for the right to operate and manage the Hotel. (*Id*. at ¶ 47, Exhibit A.) The letter enclosed the complaint from the New York Litigation and asserted intellectual property claims related to the Hotel. (*Id*.)

The intellectual property claims in the "Avington Letter" are unjustified and without merit. (*Id*. at ¶¶ 134, 175, 178.) For example, one claim is an allegation of trade dress infringement under Lanham Act. (*Id*. at ¶¶ 136, 140-141.) It is unjustified because the asserted trade dress is nothing unique, unusual, or unexpected in a hotel; at best, the asserted trade dress are mere refinements of the design and décor one would expect to encounter in a hotel. (*Id*. at ¶ 176.)  Further, the asserted trade dress also lack any cognizable secondary meaning in the mind of consumer, because such secondary meaning is impossible in a "bespoke" hotel that has never been opened or operated under the Life House brand. (*Id*. at ¶ 177.) And regardless of these allegations, HNA owns all rights to the renovations, furniture, and fixtures purchased for the Hotel between 2019 and 2020. (*Id*. at ¶ 174.)

After receiving the Avington Letter, the Avington Group put the RFP process on hold for fourteen (14) days while it evaluated the situation, and then resumed soliciting Potential Operators. (*Id*. at ¶¶ 48, 51.) One of those Potential Operators, Evolution Hospitality ("Evolution") began negotiations with HNA, and by January 2021 had progressed to the stage of signing a letter of

intent to manage and operate the Hotel and exchanging contract terms for the management agreement. (*Id*. at ¶ 51.)

On February 10, 2021, Defendant Bryan Dunn ("Dunn"), who is the "Head of Growth at Life House," called Kathleen Hollis, Senior Vice President of Business Development, at Evolution. (*Id*. at ¶ 55.) Dunn told Hollis that Life House was suing HNA, that it believed it was still rightfully entitled to manage the Hotel under the Hotel Management Agreement, and that if Evolution entered into a contract with HNA, it would sue Evolution as well. (*Id*. at ¶ 56.)  It is clear that Dunn called Hollis with the express intent to prevent Evolution from contracting with HNA, and thus interfered with weeks of negotiations between HNA and Evolution. (*Id*. at ¶ 57.)

On February 15, 2021, Life House also sent a letter to Aimbridge Hospitality ("Aimbridge Letter"), Evolution's parent company, threatening to sue for violating Life House's intellectual property rights and for violating Kathleen Hollis's non-solicitation and non-compete agreement. (*Id*. at ¶ 58, Exhibit B.)  Shortly after, on February 17, 2021, as a result of Defendants' threats, Evolution informed HNA that it was no longer interested in managing or operating the Hotel. (*Id*. at ¶ 59.)

Similar to the intellectual property claims asserted in the Avington Letter, the intellectual property claims in the Aimbridge Letter, including the trade dress allegations, are unjustified and meritless. (*Id*. at ¶¶ 158, 161-162, 175-178.)

When HNA was negotiating with Evolution, and when Evolution signed the letter of intent to manage and operate the hotel, the target opening date for the Hotel was April 1, 2021. (*Id*. at ¶ 61.) As a result of Evolution declining to manage the Hotel, HNA had to restart the process of obtaining a new manager, causing HNA to incur further costs to maintain the Hotel while not receiving any revenues. (*Id*. at ¶ 62.) The inability for HNA, due to Defendants improper and

tortious actions, to re-open and operate the Hotel for several months as a going concern, has caused irreparable harm to HNA. (*Id*. at ¶ 50, 60, 66, 229, 234-236.) HNA has also been deprived of its choice to manage and operate the Hotel, Evolution, which represents an irreparable harm to HNA. ((*Id*. at ¶¶ 59-62, 234.) Further, the threat of losing future operator due to Defendants' interference represents a likely irreparable harm to HNA. (*Id*. at ¶ 66.)  Indeed, on March 9, 2021, HNA signed a management agreement for the Hotel with a Potential Operator, and expects to re-open the Hotel on May 15, 2021. (*Id*. at ¶ 63.) Any interference with this new contractual arrangement by Defendants would cause even further harm to HNA, because of the delays, costs, fees, and deprivation of choice, as has already occurred from past interference from Life House. (*Id*. at ¶ 66.)

Despite the Termination, Life House still desires to manage and operate the Hotel. From September 2020 through the date of the Complaint and this Motion, Life House has continually contacted HNA about Life House's interest in managing and operating the Hotel under a new management agreement. (*Id*. at ¶ 64.) HNA has denied all offers by Life House that included Life House as manager and operator of the Hotel. (*Id*. at ¶ 65.)

C.    **Life House's Interference Through False Advertising**

Since at least 2019, Life House has listed the Hotel on its domain, www.lifehousehotels.com (the "Life House Website"). (*Id*. at ¶ 67.) Further, from at least 2020 until late February 2021, Life House listed the Hotel under the "Our Hotels" section of the Life House Website and stated "Coming Soon" (the "Coming Soon Listing"). (*Id*. at ¶ 68.)

Any listing of the Hotel on Life House's Website as "Our Hotel" and "Coming Soon" following the Termination was literally false and likely to cause confusion or mistake to the consuming public and Potential Operators of the Hotel, because Life House has had no affiliation

or connection with the Hotel since September 2020. (*Id*. at ¶ 69.) Consumers and Potential Operators who viewed Life House's Coming Soon Listing would mistakenly believe that Life House was affiliated with or connected to the Hotel, when this was not the case. (*Id*. at ¶¶ 70-71.)

Based on its pattern of interference and continual desire to operate the Hotel on its own terms, Life House likely deliberately posted its Coming Soon Listing after the Termination, or deliberately did not take down the Coming Soon Listing after the Termination, in order to deceive and confuse the consuming public and Potential Operators. (*Id*. at ¶ 72.) This literally false listing was likely a further attempt to gain leverage in the possible negotiation of a new management contract with HNA for the Hotel. (*Id*.)

The false Coming Soon Listing has caused harm to HNA because the consuming public mistakenly believed that Life House would be operating the Hotel "Soon," and that booking at the Hotel operated by Life House would be available. (*Id*. at ¶ 73.) However, in reality, bookings would never be available at the Hotel while operated by Life House, thus, a false and negative impression was created by Life House in the consuming public about the Hotel, which would carry over to when the Hotel actually re-opens, causing a loss of good will and future revenue. (*Id*.)  The false and misleading Coming Soon Listing also caused harm to HNA because Potential Operators falsely and mistakenly believed that Life House was still operating the Hotel, thus, preventing or interfering with HNA's efforts to engage a new operator and to re-open the hotel, which has been a continuing detriment to HNA because of the loss of revenue and goodwill associated with an open, going-concern hotel. (*Id*. at ¶¶ 74-75.)

In late February 2021, Life House changed the listing for the Hotel under its "Our Hotels" section of its website to "Designed By." (*Id*. at ¶ 77.) Life House undoubtedly changed the listing

for the Hotel on the Life House Website because counsel for HNA provided notice to counsel for Life House that the Coming Soon Listing was false and misleading. (*Id*. at ¶ 78.)

Following the Termination, Life House also placed and/or maintained listings for the Hotel on multiple third party websites (e.g., Expedia, Travelocity, Kayak) under the name "Life House, Ocean Drive" (the "Third Party Listings"). (*Id*. at ¶ 80.) These Third Party Listings were, and are, literally false and likely to cause confusion or mistake to the consuming public and Potential Operators of the Hotel. (*Id*. at ¶ 81.) Consumers and Potential Operators who viewed the Third Party Listings would still mistakenly believe that Life House was affiliated or connected with the Hotel or they had the ability to make bookings at the "Life House, Ocean Drive," when this was not the case due to the Termination. (*Id*. at ¶ 82-83.)

Based on its pattern of interference and continual desire to operate the Hotel on its own terms, Life House placed, or deliberately did not remove the listings, following the Termination, in order to deceive and confuse the consuming public and Potential Operators and to create false association with the Hotel. (*Id*. at ¶ 84.) Life House likely engaged in these actions because Life House was attempting to negotiate a new management contract with HNA for the Hotel and believed its false and misleading association with the Hotel would provide leverage in such negotiations due to the loss of revenue to HNA, costs to HNA, loss of goodwill to HNA, and false association with the Hotel formed in the minds of consuming public. (*Id*.)

On February 24, 2021, counsel for HNA sent letters to six third party websites (Expedia, Travelocity, Hotels.com, Agoda, Kayak, and TripAdvisor), each of which had a Third Party Listing, indicating that the listings were false and misleading because Life House has not been affiliated or connected with the Hotel since the Termination. (*Id*. at ¶ 86.) As of the date of the Complaint, TripAdvisor, Hotels.com, and Agoda have removed the listing for "Life House, Ocean

Drive" from their websites. (*Id*. at ¶ 87.) As of the date of this Complaint, at least three Third Party Listings placed and maintained by Life House are active and have not been taken down: Expedia, Travelocity, and Kayak. (*Id*. at ¶ 92.)

The Expedia Listing is a good example of the literal falsity and consumer confusion caused by Life House's Third Party Listings. The Expedia Listing[1] indicates that the Life House, Ocean Drive is located at the site of Hotel (350 Ocean Drive, Miami Beach, FL), which is not the case because Life House has had no affiliation or connection with the Hotel since the Termination.  (*Id*. at ¶ 93.) The Expedia Listing also allows consumers to "Choose Dates" and "Availability," which is also literally false because the Hotel is not open or accepting bookings, and will never be open or accepting bookings in affiliation with Life House. (*Id*. at ¶ 94.)

 Life House has not taken any steps to dispel the false impression and confusion caused to the consuming public and Potential Operators by the Expedia Listing or other Third Party Listings. (*Id*. at ¶¶ 95-96, 106-107, 117-118.) Further, at no time prior to the filing of the Complaint does it appear that the Expedia Listing has changed, thus, the consuming public could easily try to book a room at the "Life House, Ocean Drive" *right now* without knowing Life House has no affiliation or connection with the Hotel and that any such booking is an impossibility. (*Id*. at ¶ 97.)

At no time prior to the filing of the Complaint does it appear that the Expedia Listing has featured any disclaimer that Life House is not associated or connected with the Hotel or that a room cannot be booked for the future. So, in practical terms, this means that when the consuming public attempts to book a room through the Expedia Listing and is unsuccessful, a negative

---

[1] The Expedia Listing discussed herein is captured from date of the Complaint – months after the Termination. (*See* Complaint, Exhibit E). The Travelocity Listing and Kayak Listing contain similar, literally false statements regarding Life House's affiliation or connection with the Hotel and the ability to book accommodations at the Hotel. (*See id*. at ¶¶ 104-125, Exhibit F-G).

impression of the Hotel is created, which is entirely due to the literally false nature of the Expedia Listing placed and maintained by Life House. (*Id*. at ¶ 98.) The negative impression of the Hotel felt by consumers due to the Expedia Listing has likely caused, and will likely cause, irreparable harm to HNA, because consumers will avoid making bookings in the future at the Hotel or provide negative ratings. (*Id*. at ¶ 99.) The literally false Expedia Listing also causes irreparable harm to HNA because Potential Operators will falsely and mistakenly believe that Life House is still operating the Hotel, thus preventing or interfering with HNA's efforts to negotiate and contract with an operator that will re-open the hotel, which is a major detriment to HNA because of the loss of revenue and goodwill associated with an open, going-concern hotel. (*Id*. at ¶ 100-101.) Each day the literally false Expedia Listing is active and not corrected allows for irreparable consumer confusion regarding the affiliation of the Hotel and bookings at the Hotel. (*Id*. at ¶ 102.)

As described in an August 2017 Federal Trade Commission Report to Congress regarding the "Online Hotel Booking Market," the type of false information in the Third Party Listings has a material effect on consumer purchasing decisions:

> False or misleading material information about hotels can harm both consumers and competition. Such information harms consumers because it affects or is likely to affect their choices among hotels. False or misleading material information also harms hotels that lose customers to deceitful competitors as well as undermines consumer confidence in the market for hotel rooms.

(*Id*. at ¶ 89, Exhibit C.)

False advertising and fraudulent bookings are no small problem in the hotel marketplace. The American Hotel and Lodging Association reports that some 55 million online hotel bookings are affected by fraudulent websites and call centers posing as hotel websites and there are $3.9 billion worth of bad bookings per year. (*Id*. at ¶ 90, Exhibit D.)

## III.    ARGUMENT

HNA is seeking entry of a temporary restraining order ("TRO") and preliminary injunction: (i) ordering Life House to take down all third party website listings that advertise or promote bookings or accommodations at the "Life House, Ocean Drive" or any other listing that affiliates or connects Life House with the Hotel; (ii) enjoining Life House from placing any listing, including website listings, that advertises or promotes bookings or accommodations at the "Life House, Ocean Drive" or any other listing that affiliates or connects Defendants with the Hotel; and (iii) enjoining all communications or contacts by Defendants with parties with whom HNA is negotiating and contracting to manage and operate the Hotel. The requested relief is essential to stopping Defendants' intentional acts of deception and interference and the associated irreparable harm to HNA.

### A.    The TRO and Preliminary Injunction Standard

In the prior weeks and months Defendants have made a concerted effort to (1) stop HNA from negotiating a management agreement with a Potential Operator and (2) re-open the Hotel. Defendants' unlawful actions include maintaining literally false advertisement through Third Party Listings, which deceive the consuming public about (1) the Life House's affiliation and connection with the Hotel and (2) the ability of consumers to book accommodations at the Hotel. Defendants' actions also include threatening Potential Operators and other HNA business relationships with unjustified intellectual property claims in order to prevent HNA from engaging a Potential Operator of its own choosing, negotiating and executing a new management contract with said Potential Operator, and re-opening the Hotel.

Absent a TRO, Defendants will continue these concerted actions solely in an illegal attempt to prevent HNA from re-opening the Hotel to the consuming public with an operator of its

choosing. This Court should prevent this injustice from occurring by entering a TRO, and later a preliminary injunction that precludes Defendants from continuing its unlawful actions.

In this Circuit, the standard for obtaining a TRO and the standard for obtaining a preliminary injunction are the same. *See Emerging Vision, Inc. v. Glachman*, Case No. 10-cv-80734, 2010 WL 3293346, at *3 (S.D. Fla. June 29, 2010) (citing *Siegel v. LePore*, 120 F. Supp. 2d 1041 (S.D. Fla. 2000) aff'd 234 F.3d 1163 (11th Cir. 2000)). In order to obtain a TRO or a preliminary injunction, the moving party must establish four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to plaintiff outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest." *See e.g., N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008). As set forth above and below, HNA is legally entitled to a TRO and preliminary injunctive against Defendants because these four elements weigh heavily and compellingly in HNA's favor.

**B.     A TRO and Preliminary Injunction Are Justified for the False Advertising Claim**

**1.     HNA is Likely to Prevail on the Merits Based on the False Advertising Contained in the Third Party Listings**

To establish a likelihood of success on the merits of a false advertising claim, the movant must demonstrate the following: "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been-or is likely to be-injured as a result of the false advertising." *N. Am. Med. Corp.*, 522 F.3d at 1225.

### (a) The Third Party Listings Are Literally False

The first element is satisfied if the challenged advertisement is literally false. *See, e.g., Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). Here, the Third Party Listings, as evidenced by the Expedia Listing, the Travelocity Listing, and the Kayak Listing, are literally false. (See Complaint at ¶¶ 80-83, 93-94, 104-105, 115-116, Exhibits E-G.) Each of the listings indicates: "Life House, Ocean Drive" is located at 350 Ocean Drive (the address of the Hotel); and that the "Life House, Ocean Drive" is available, or might be available, for booking. (*See id.* at ¶¶ 93-94, 104-105, 115-116.) It is indisputable that Life House currently has no connection or affiliation with the Hotel, and has not had any connection or affiliation with the Hotel since the Termination. (*Id.* at ¶¶ 37-38.) It is also indisputable that no bookings have been available or ever will be available at the "Life House, Ocean Drive." (*Id.* at ¶ 42, 63, 65.) The Third Party Listings are literally false.

### (b) The Literally False Third Party Listings Are Presumed to Cause Consumer Deception

If an advertisement is literally false, as is the case here, "the movant need not present evidence of consumer deception." *Johnson & Johnson Vision Care*, 299 F.3d at 1242. "When an advertisement is shown to be literally or facially false, consumer deception is presumed, and the court may grant relief without reference to the advertisement's [actual] impact on the buying public .... This is because plaintiff's alleging a literal falsehood are claiming that a statement, on its face, conflicts with reality, a claim that is best supported by comparing the statement itself with the reality it purports to describe." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d. Cir. 2007).

### (c)   The Third Party Listings False Statements are Material to Consumer Purchasing Decisions.

"To establish materiality, the movant must "establish that the defendant's deception is likely to influence the purchasing decision." *N. Am. Med. Corp.*, 522 F.3d at 1226. A movant may establish the materiality requirement by proving that the "the defendants misrepresented an inherent quality or characteristic of the product." *Johnson & Johnson Vision Care*, 299 F.3d at 1250 (internal citations and quotations omitted).

Here, the evidence amply supports the conclusion that Life House's false statements about the Hotel are material to consumers' decisions about choices among hotels. (*See* Complaint at ¶¶ 82-83, 89-90, 98-99, 108-109, 119-120, 197-198, Exhibits C-D.) Specifically, the types of false statements about the Hotel made by Life House are precisely the type of harmful information that the Federal Trade Commission reported on to Congress:

> False or misleading material information about hotels can harm both consumers and competition. Such information *harms consumers because it affects or is likely to affect their choices among hotels.* False or misleading material information also harms hotels that lose customers to deceitful competitors *as well as undermines consumer confidence in the market for hotel rooms.*

(*Id.* at ¶ 89, Exhibit C).

False advertising and fraudulent bookings are a major problem in the industry as described by the American Hotel and Lodging Association, which reports that some 55 million online hotel bookings are affected by fraudulent websites and call centers posing as hotel websites and there are $3.9 billion in bad bookings per year. (*See id.* at ¶ 90, Exhibit D.)

### (d)    The Third Party Listings Affect Interstate Commerce

The Third Party Listings, which include Life House's false advertising, were placed and used in interstate commerce through various websites, including Expedia, Travelocity, and Kayak. (*Id.* at 80, 86, 92, 127, 130, 202).

       **(e)**     **HNA Has Been and is Likely to Be Irreparably Harmed as a Results of the False Advertising Contained in the Third Party Listings**

Proof of injury can come in the form of direct diversion of sales from a plaintiff to defendant or a loss of good will associated with the product. *See, e.g., Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 915 F. Supp. 360, 365-66 (S.D. Fla. 1996).

Here, the harm from the false advertising is irreparable and difficult to quantify. Specifically because the Hotel is closed and has yet to re-open, each day the literally false Third Party Listings have been, and are, active and not corrected allows for irreparable consumer confusion of unquantifiable magnitude regarding the true affiliation of the Hotel and ability to make bookings at the Hotel. (*See* Complaint at ¶¶ 102, 113, 124, 197, 210.) Such consumer confusion has led, and will lead to a loss of goodwill and diversion of future revenue due to the false negative impression of the Hotel by the consuming public who will avoid making bookings in the future at the Hotel or provide negative ratings (*See id.* at ¶¶ 84, 98-99, 109-110, 120-121, 204, 207, 210.)

       **2.**     **HNA Has Been and is Likely to Be Irreparably Harmed**

As described above, the loss of goodwill and diversion of future revenue through false negative impression in the consuming public increases on a daily basis as long as Third Party Listings are active. Thus, the irreparable injury will continue to occur if the Third Party Listings are not ordered to be taken down and enjoined from placement in the future. As one court duly noted:

> If the complainants be not protected by preliminary injunction against such use... there is every inducement to the defendant to delay and prolong the litigation, continuing, meanwhile, the assaults upon the good will of the complainants, so that, even if a final decree be at last rendered in favor of the complainants, the good will have been so seriously and irreparably injured, if not in a great measure destroyed, as to leave the complainants practically without a remedy.

*Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1359 (E.D.N.Y.

1994) (quoting *Garrett v. T.H. Garrett & Co.*, 78 F. 472, 479 (6th Cir. 1896)).

### 3.   The Balance of Harm Favors an Injunction

Under these circumstances, the balance of hardships is overwhelmingly in HNA's favor.

While the injury to HNA is immeasurable and irreparable, the only "harm" to Life House will be

the take down of *literally false advertisements of the Hotel* and injunction against its attempts to

falsely advertise the Hotel. In short, it defies comprehension to suggest there is any real risk of

harm to Life House from this relief – *i.e.*, removing or preventing literally false advertisements.

### 4.   Preliminary Injunction Would Serve the Public Interest

"The Lanham Act's prohibition against false advertising protects the rights of consumers

to receive only truthful commercial information and the rights of competitors to compete in a

market free from untruthful information. As one court concluded, 'the Congressional intention was

to *allow a private suit by a competitor to stop the kind of unfair competition that consists of lying*

*about goods or services, when it occurs in interstate commerce.*'" *Tire Kingdom*, 915 F. Supp. at

364 (emphasis added). As the Third Party Listings are literally false, an order taking down the

Third Party Listings and enjoining the further placement of any Third Party Listings would not

disserve the public interest. And simply from a practical perspective, there is no "Life House,

Ocean Drive," and there never will be a "Life House, Ocean Drive;" it cannot harm the public

interest to order the take down of advertisements for a property that never did exist and never will

exist and to enjoin such advertisements from being placed in the future.

### B.   A TRO and Preliminary Injunction is Justified on Tortious Interference Claim.

### 1.   HNA is Likely to Prevail on its Tortious Interference Claim

The elements of tortious interference are 1) the existence of a business relationship under which the claimant has rights; 2) the defendant's knowledge of the relationship; 3) an intentional and unjustified interference with the relationship; 4) by a third party; and 5) damages to the claimant caused by the interference. *E.g.*, *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985).

Here, there can be no dispute that there is an actual and identifiable business relationship between HNA and Avington and Evolution. (*See* Complaint at ¶¶ 46, 52-53.) Further, given that Defendants specifically threatened Avington and Evolution and mentioned the operation of the Hotel shortly after these parties began negotiating and/or entered a business arrangement with HNA, it is impossible to suggest that Defendants did not have knowledge of that relationship. (*See id.* at ¶¶ 47, 55-58.)

Next, Defendants are not, and were not, a party to HNA's contracts or negotiations with Avington and Evolution. (*See* Complaint at ¶¶ 46, 52-43, 65.)

Moreover, Defendants have intentionally and unjustifiably interfered with Potential Operators, and parties attempting to assist HNA in negotiating with a Potential Operator, through overt threats of litigation, including unjustified and false intellectual property claims and false claims about Life House's continued right to manage the Hotel. (*See id.* at ¶¶ 47, 55-58, 228, 233.) Defendants made these threats solely with the express intention of eliminating Potential Operators from consideration for a management contract with the Hotel – in favor of negotiating *their own management contract with the Hotel*. (*See id.* at ¶¶ 64-65, 228, 233)

And last, HNA has been injured by the extended delays in its efforts to negotiate a management contract with a Potential Operator of its choosing and to re-open the Hotel. (*See id.* at ¶¶ 50, 59-62, 236.) Accordingly, HNA is likely to succeed on its tortious interference claim.

### 2.      HNA Has Been and is Likely to Be Irreparably Harmed

As described above, as a direct and proximate result of Defendants' continued interference with HNA's business relationships, HNA has been deprived of a choice of Potential Operator to manage and operate the Hotel, Evolution. (*See id.* at ¶ 59.) Further, in combination with interference with HNA's relationship with Aimbridge, Defendants have effectively delayed the opening of the Hotel by weeks and months.  (*See id.* at ¶¶ 50, 59-63.) The loss of its first choice to operate the Hotel, and the continued delayed opening of the Hotel, represents an irreparable harm to HNA. (*See id.*at ¶ 50, 59-63, 229, 234-236) More, the threat of losing future Potential Operators and incurring more delays due to Defendants' wrongful interference represents a likely irreparable harm to HNA. (*See id.* at ¶ 69.) If Defendants' interference is not enjoined, HNA faces the real threat that it may not be able to re-open and operate the Hotel – and this is the precise result intended by Life House's interfering actions. Life House wants to manage the Hotel and is clearing the marketplace of competitors through wrongful interference so that there are no competitors available for HNA to choose from. (*See id.* at ¶ 64.)

### 3.      The Balance of Harm Favors an Injunction

Under these circumstances, the balance of hardships also tips decidedly in HNA's favor. HNA desires to negotiate and contract with Potential Operators and re-open and operate the Hotel. At least one operator chosen by HNA (Evolution) has been dissuaded by Life House's interference. (*See id.* at ¶ 59.) And without an injunction, Life House will continue to pursue such wrongful interference to prevent the re-opening and operation of the Hotel until there are no Potential Operators left other than itself.  The only detriment to Life House is the inability to send threatening letters or communications to HNA's business relations. To the extent Life House believes its intellectual property allegations or other allegations have any merit, Life House can bring a suit to

enforce their alleged rights; an injunction would not prevent such suit. Thus, there is no real risk of harm to Defendants in granting the injunction.

### 4. A Preliminary Injunction Would Serve the Public Interest

Enjoining the interference, and allowing for the re-opening and operation of the Hotel would serve the public interest. Threatening letters and communications with unjustified allegations have no public interest, particularly, since Life House is using such threats as a means to eliminate all Potential Operators from the marketplace.

### C. THE BOND TO SECURE THE INJUNCTIVE RELIEF

District Courts must set bond requirements when issuing restraining orders or a preliminary injunction. *See* Fed. R. Civ. Pro. 65(c). District Courts have discretion to set the bond amount "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *Id.* Because of the negligible costs and damages (if any) that may be sustained by Defendants here, HNA requests this Court require HNA to post a bond of no more than five thousand dollars ($5,000.00).

## IV. CONCLUSION

For the reasons described herein, HNA respectfully requests the Court enter a TRO and preliminary injunction: (1) ordering Life House to take down all third party website listings that advertise or promote bookings or accommodations at the "Life House, Ocean Drive" or any other listing that affiliates or connects Defendants with the Hotel; (2) enjoining Life House from placing any listing, including website listings, that advertises or promotes bookings or accommodations at the "Life House, Ocean Drive" or any other listing that affiliates or connects Defendants with the Hotel; (3) enjoining all communications or contacts by Defendants with parties with whom HNA

is negotiating and contracting to manage and operate the Hotel; and (4) for such other relief as this

Court deems just and proper.

Dated: March 16, 2021                              Respectfully submitted,

                                                   By:*/s/ Naomi M. Berry*
                                                   Merrick L. Gross
                                                   Florida Bar No. 716677
                                                   Naomi M. Berry
                                                   Florida Bar No. 69916
                                                   CARLTON FIELDS, P.A.
                                                   700 NW 1st Ave, Ste. 1200
                                                   Miami, Florida 33136-4118
                                                   Telephone: (305) 530-0050
                                                   Facsimile:  (305) 530-0055
                                                   Email: mgross@carltonfields.com
                                                   nberry@carltonfields.com
                                                   mcabrera@carltonfields.com

                                                   J. Coy Stull
                                                   Florida Bar No. 15764
                                                   CARLTON FIELDS, P.A.
                                                   4221 W. Boy Scout Blvd., Suite 1000
                                                   Tampa, Florida 33607-5780
                                                   Telephone: (813) 223-7000
                                                   Facsimile:  (813) 229-4133
                                                   Email: jstull@carltonfields.com

                                                   *Attorneys for Plaintiff HNA LH OD, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing MOTION FOR ENTRY OF  TEMPORARY RESTRAINING  ORDER  AND  PRELIMINARY  INJUNCTION  AND MEMORANDUM OF  LAW  IN  SUPPORT  THEREOF  to  be  served  at  the  same  time  as  the  Verified Complaint,  filed  on  March  16,  2021,  on  each  of  the  named  Defendants:  Local  House International,  Inc., LH 350 Ocean Manager, LLC, and Bryan Dunn.

*/s/ Naomi M. Berry*
Naomi M. Berry

125273067.2